IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MELISSA BROWN,                            )
                                          )
        Plaintiff,                       )
                                          )
    v.                                    )    1:24-cv-477 (LMB/IDD)
                                          )
NELSON SMITH, in his official capacity as )
    Commissioner of the Virginia Department of )
    Behavioral Health and Developmental       )
    Services,                             )
                                          )
        Defendant.                       )

## MEMORANDUM OPINION

Plaintiff Melissa Brown ("plaintiff" or "Brown") brings an as-applied challenge to Virginia's "barrier statute," Va. Code § 37.2-416.1, alleging that the statute violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution by categorically disqualifying her for life from holding a direct care position in a state-licensed addiction treatment facility because of her two-decades-old robbery conviction. [Dkt. No. 1] ("Compl."). Before the Court are the cross-motions for summary judgment of plaintiff and defendant Nelson Smith, who is sued in his official capacity as Commissioner of the Virginia Department of Behavioral Health and Developmental Services ("defendant" or "Smith"). [Dkt. Nos. 42, 44] ("Motions"). The Motions are fully briefed and oral argument has been held. For the reasons that follow, each Motion will be granted and denied in part, judgment will be entered in favor of Brown on her Equal Protection claim, and defendant will be ordered to provide plaintiff with an individualized screening assessment.

## I. BACKGROUND

A. <u>Factual Background</u>

The following facts are not disputed. Melissa Brown is currently the Chief Growth Officer at a state-licensed addiction treatment facility in Virginia. Brown states that her work in addiction recovery has helped give her life purpose. [Dkt. No. 43-51] ("Brown Decl.") ¶ 2. After a turbulent childhood, Brown became addicted to drugs in her early twenties and began committing crimes to support her addiction. Id. ¶¶ 7, 12. In September 2000, she was convicted of shoplifting for which she was sentenced to five years' probation. [Dkt. No. 45-16] at 7. In 2001, while on probation for the shoplifting offense, Brown stole a pocketbook from a woman in a grocery store parking lot. When Brown grabbed the bag from the woman's shopping cart, the woman held onto it for about 10 feet but then released it as Brown fled. [Dkt. No. 45-10]. Brown used a bank card that was in the stolen pocketbook to withdraw $2,200 from the victim's checking account. Id. Brown pled guilty to robbery and credit card fraud. [Dkt. No. 45-9]. For her robbery conviction, she was sentenced to ten years' imprisonment—five years for the robbery offense and five years for violating her probation for the earlier shoplifting offense— with six years and five months suspended. Compl. ¶ 21; [Dkt. No. 43-1]. She was also sentenced to five years' imprisonment for the credit card fraud conviction, with that entire sentence being suspended. [Dkt. No. 43-1]. Altogether, she was sentenced to 15 years' imprisonment, with an active term of three years and six months. Id.

In 2002, but in separate cases, Brown was also convicted of grand larceny and possessing a controlled substance. [Dkt. No. 45-17] at 11–21. For those crimes, she was sentenced to an additional eight years and five months' incarceration, with seven years and 305 days suspended,

amounting to an active term of five months and 60 days. Id.[1] Notably, since 2002, Brown has not been charged with, or convicted of, any other offenses. Brown Decl. ¶¶ 11, 30.

While in prison, Brown began her college-level studies in psychology and helped other inmates study for their GEDs. Id. ¶ 13. In 2013, she graduated with a bachelor's degree in psychology, cum laude, from the University of Mary Washington. Id. ¶ 15. Brown took additional classes related to psychology and counseling at Northern Virginia Community College between 2014 and 2015. Id. ¶ 19. On January 11, 2016, Virginia Governor McAuliffe restored Brown's rights to vote, hold public office, serve on a jury, and to be a notary public. [Dkt. No. 43-3]. Later in 2016, she applied for training to be credentialed as a Certified Substance Abuse Counselor ("CSAC") by the Virginia Board of Counseling. [Dkt. No. 43-21]. On August 5, 2016, Brown obtained her CSAC certification and it has been renewed every year since then. Id.; Brown Decl. ¶ 22.

In 2014, Brown began working in a direct care position at the Family Counseling Center for Recovery ("FCCR") treating persons suffering from substance abuse. Brown Decl. ¶ 20. When Brown's employer learned about her criminal history, it reclassified her from an employee to an independent contractor, and continued her as a provider of direct services.[2] Id. ¶ 20–21. In

---

[1] Smith asserts that Brown also has three convictions for parental abduction, obtaining money by false pretenses, and felony concealment. [Dkt. No. 45] at 3, 8. In support of that assertion, Smith points to a Pre-Sentence Report and Attorney's Notice of Prior Convictions, both dated 2002. Id. Those sources do not carry the evidentiary weight required to establish Brown's convictions. Because the record does not include either a judgment or sentencing order, or any similar official document, the Court cannot conclude that Brown was actually convicted of those three offenses, only that she was charged with them. [Dkt. No. 45-5] at 3.

[2] At the time, the barrier law applied only to compensated employment. Compare Va. Code § 37.2-416.1(B) (prohibiting "[h]ir[ing] for compensated employment" and "[a]llow[ing] any person under contract . . . to serve in a direct care position"), with id. § 37.2-416 (as effective from July 1, 2012, through June 30, 2016) (containing only the "hire for compensated employment" prohibition; see also [Dkt. No. 43-59] at 25.

early 2018, new ownership took over FCCR and renamed it "Pinnacle Treatment Centers" ("Pinnacle"). Id. ¶¶ 23–24; [Dkt. No. 45-17] at 1. In April 2018, Pinnacle promoted Brown to Clinical Supervisor, a job involving "[s]upervis[ing], manag[ing] and provid[ing] leadership for all clinical staff members as well as the overall clinical operations of the program," id. ¶ 23; [Dkt. No. 45-18] at 3; however, in September 2018, Pinnacle informed Brown that she could no longer work as the Clinical Supervisor because of her barrier crime conviction and offered her an alternative role, without direct care possibilities, as the Community Relations Coordinator. Brown Decl. ¶ 25; [Dkt. No. 45-21]. Brown accepted the position and, in August 2023, Pinnacle promoted her to be the Regional Director of Community Engagement. [Dkt. No. 45-25]. In September 2023, Brown secured a new role as the Vice President of Operations and Marketing at the Mainspring Recovery facility, owned by MSRC One, LLC ("Mainspring"). [Dkt. No. 45-27]. In 2024, Brown was promoted to Chief Growth Officer. Brown Decl. ¶ 25. None of these management positions involved providing direct care to clients. Brown has been able to provide direct care to persons suffering from addiction on a limited basis as a volunteer at the Zoe Freedom Center, a faith-based non-profit rehabilitation facility that is not subject to state licensing requirements or the barrier law, which only applies to state-licensed facilities. Id. ¶ 26.

All the evidence in the record reflects that Brown excelled in her direct care position from 2014 to 2018 and that her employer would give Brown such responsibilities in the future but for the barrier law.[3] [Dkt. Nos. 43-56 ("Halon Decl." ¶ 11), 43-52 (Adcock Decl. ¶ 11), 43-60 (Schmidt Decl. ¶ 9)].

---

[3] A disputed—but immaterial—fact is whether Brown is eligible for a higher salary if she provides direct care services. There is insufficient evidence in the record to support or defeat this contention.

B. Statutory Background

The Virginia Department of Behavioral Health and Developmental Services

("Department") regulates the treatment and care of persons coping with mental illness, substance

abuse, and developmental disabilities, 12 Va. Code 35, and also regulates the operation of state

facilities that provide treatment and care for those persons, Va. Code §§ 37.2-700, 37.2-403,

-405.

It is unlawful for a statutorily-defined "provider" to establish, conduct, maintain, or

operate any statutorily-defined "service"—or to admit, place, treat, maintain, house, or otherwise

keep any person—without a license from the Commissioner.  Va. Code § 37.2-405(A), (C).

Similarly, it is unlawful for any person to maintain or operate a statutorily-defined "service"

outside of the direct supervision of a licensed "provider."  Va. Code § 37.2-413.  Examples of

"providers" include "a hospital as defined in Va. Code § 32.1-123, community services board,

behavioral health authority, private provider, and any other similar or related person, entity, or

organization."  Va. Code § 37.2-403.  Licensed providers are subject to ongoing statutory and

regulatory requirements, including licensure renewals, inspections, and background checks.  See

Va. Code §§ 37.2-410, -411, -412, -416, -416.1.

Virginia law requires Department-licensed providers to conduct background checks and

restrict employment for certain individuals who apply to work in a "direct care position" or are

under contract with the provider to serve in such a position.  Va. Code § 37.2-416.1(B).  A

"direct care position" is one with responsibility for an individual's "treatment, case management,

health, safety, development, or well-being" in the provision of substance abuse, mental health, or

developmental services or one with responsibility for "immediat[e] supervision[]" over such a

position.  Va. Code § 37.2-416.1(A).  Brown aspires to work in a direct care position as a

substance abuse counselor and is therefore subject to the employment restrictions under § 37.2-416.1.

Department-licensed providers are prevented from hiring, promoting, or transferring employees in direct care positions who have committed statutorily-defined "barrier crimes," which are listed in clauses (i), (ii), (iii), and (iv):

- **clause (i):** robbery; felony violations of certain protective order provisions; aggravated murder; felony homicide; voluntary and involuntary manslaughter; shooting, stabbing, cutting, or wounding in commission of a felony or with intent to main, disable, disfigure, or kill; assault or battery by mob; felony gang offenses; terrorism-related offenses; abduction and kidnapping offenses; malicious wounding offenses; maiming through intoxicated vehicular operation; strangulation or suffocation; certain offenses related to firearms and other weapons; poisoning-related offenses; injury of correctional-facility personnel or probation or parole officials by a prisoner, probationer, or parolee; felony hazing; assaults and batteries not subject to exceptions; pointing a laser at a law-enforcement officer, probation or parole officer, correctional officer, or other correctional personnel; disarming a law-enforcement officer, correctional officer, or other correctional personnel; carjacking; extortion; threatening the Governor or the Governor's immediate family; felony stalking; rape and other sex offenses; prostitution-related offenses not subject to the above-referenced exceptions; obscenity-related offenses; offenses relating to bombing, burning, or destroying structures or other property or things; failing to secure medical attention for an injured child; abuse and neglect of vulnerable adults or children; felony offenses related to riot or unlawful assembly; insurrection-related offenses; burning crosses or other objects, using swastikas, or displaying nooses to intimidate; offenses related to paramilitary activity; delivering drugs, firearms, or explosives to prisoners or other committed persons; offenses related to escape from confinement and other felonies by prisoners; offenses within secure juvenile facilities or detention homes; treason; and offenses related to the overthrow of government;

- **clause (ii):** offenses relating to burglary and breaking and entering;

- **clause (iii):** offenses relating to the manufacture, sale, gift, distribution, or possession of certain quantities of mixtures or substances containing controlled substances; and

- **clause (iv):** felony offenses for possession of a controlled substances.

See Va. Code. § 37.2-416(B)(1)-(4), -416.1(B)(1)-(2). Brown's robbery conviction is an offense under clause (i) of the "barrier crime" definition, which, unless one of the narrow exceptions discussed below applies, categorically bars Brown from working in a direct care position as a mental health, developmental services, or substance abuse counselor. Va. Code § 19.2-392.02(A). Those exceptions permit individuals to serve in a direct care position if they were: (1) convicted of a clause (iv) offense that was committed at least five years prior, and the individual is no longer on probation or parole and has paid the required court costs, Va. Code § 37.2-416.1(B)(1)-(2); (2) convicted of certain substance abuse offenses, including most clause (iii) offenses, and the offense was committed at least four years prior, Va. Code § 37.2-416.1(C); (3) convicted of no more than one count of assault and battery against a family or household member, and that offense was committed at least 10 years prior, Va. Code § 37.2-416.1(G); or (4) convicted of certain misdemeanor and felony offenses and "the hiring provider determines, based upon a screening assessment, that the criminal behavior was substantially related to the applicant's substance abuse or mental illness and that the person has been successfully rehabilitated and is not a risk to individuals receiving services based on his criminal history background and his substance abuse or mental illness history," Va. Code § 37.2-416.1(D) (screening provision). The following eight misdemeanor and 23 felony offenses are eligible for screening:

> **Misdemeanor** (1) hazing; (2) reckless handling of firearms; (3) simple assault and battery; (4) first-offense assault and battery against a family or household member; (5) threat of death or bodily injury to a school employee or health care provider; (6) threat of death or bodily injury to intimidate a civilian population or influence a government; (7) pointing, holding, or brandishing of a firearm, air or gas operated weapon or object similar in appearance; and (8) prostitution, commercial sex conduct or commercial exploitation of a minor.
>
> **Felony** (1) reckless endangerment by throwing objects from places higher than one story; (2) threat of death or serious bodily harm to a person or a member of his

7

family; (3) threat of death or discharge of a firearm on school property; (4) burglary; (5) breaking and entering a dwelling with intent to commit a misdemeanor; (6) possession of a burglarious tool; (7) manufacturing, selling, giving, distributing or possessing with intent to manufacture, sell, give, or distribute a controlled substance or imitation controlled substance; (8) transporting controlled substances into the Commonwealth; (9) allowing a minor or incapacitated person to be present during manufacture of methamphetamine; (10) manufacturing, selling, giving, distributing or possessing with intent to manufacture, sell, give, or distribute methamphetamine; (11) selling, giving, distributing or possessing with intent to sell, give, or distribute marijuana; (12) manufacturing, selling, giving, distributing or possessing with intent to manufacture, sell, give or distribute anabolic steroids; (13) possession of controlled substances; (14) possession of marijuana; (15) possession and distribution of flunitrazepam; (16) possession and distribution of gamma-butyrolactone or 1, 4-butanediol; (17) distribution of certain drugs to persons under 18; (18) conspiracy to commit a drug offense; (19) attempt to commit a drug offense; (20) maintaining a premises deemed a common nuisance; (21) maintaining a fortified drug house, (22) obtaining drugs or procuring administration of controlled substances or marijuana by fraud, deceit, or forgery; and (23) assisting individuals in unlawfully procuring prescription drugs.

Va. Code § 37.2-416.1(D); [Dkt. No. 43-18] at 6–7. The screenable felony offenses range from Class 6 to Class 2 felonies under Virginia's classification system. Va. Code § 18.2-10(c).

Four additional categories of convicted persons may provide direct care services:

First, anyone convicted of a clause (iv) offense and who is approved via the screening process may serve as a "peer recovery specialist" at an adult substance abuse treatment program. Va. Code § 37.2-416.1(D).

Second, individuals may serve in a direct care position if (i) convicted of no more than one count of assault and battery against certain government employees; (ii) "granted a simple pardon if the offense was a felony committed in Virginia, or the equivalent if the person was convicted under the laws of another jurisdiction;" (iii) "more than 10 years have elapsed since the conviction;" and (iv) approved via the screening process. Va. Code § 37.2-416.1(E).

Third, individuals may serve in a direct care position if they held such a role before July 1, 1999 and "had no convictions in the five years prior to the application date for employment." Va. Code § 37.2-416.1(A) ("grandfather clause").

Fourth, individuals may serve in a direct care position if convicted of a barrier offense after being hired by a Department-licensed provider, subject to their employer's discretion. Va. Code § 37.2-416.1; see also 12 Va. Admin. Code §§ 35-105-150(5), -400(B). Because providers are not obligated to conduct periodic background checks, there is no formal mechanism to discover whether current employees have been convicted of a crime since being hired. Even if current employees are "promot[ed] from one adult substance abuse or adult mental health treatment position to another such position within the same licensee," a new barrier conviction would not bar them from continuing to work. Va. Code § 37.2-416.1(A). The categorical bar is applied for this subset of employees only if they are promoted or transferred from a substance abuse position to "any mental health or developmental services direct care position." Va. Code § 37.2-416.1(A).

C. Procedural History

Against this complex statutory backdrop, Brown's three-count complaint alleges that Va. Code § 37.2-416.1 violates the Equal Protection, Due Process, and Privileges or Immunities Clauses of the Fourteenth Amendment to the United States Constitution by categorically disqualifying her for a position as a Department-licensed substance abuse counselor. On April 19, 2024, Smith filed a Motion to Dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). After full briefing and oral argument, the Court granted the defendant's Motion in part and dismissed Count III, the Privileges or Immunities count. With discovery completed, the parties filed cross-Motions for Summary Judgment. [Dkt. Nos. 42, 44]. Since oral argument, Brown has filed two notices of supplemental authority, to which Smith has responded.

9

## II. DISCUSSION

### A. Standard of Review

Federal Rule of Civil Procedure 56(c) provides that a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Phoenix Sav. & Loan v. Aetna Cas. & Sur. Co., 318 F.2d 245 (4th Cir. 1967). Summary judgment is not a "disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp., 477 U.S. at 327. It is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." Drewitt v. Pratt, 999 F.2d 774, 778–79 (4th Cir. 1993).

The Court must determine "whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The moving party has the initial burden of informing the Court of the legal basis for the motion and of pointing to the relevant portions of the pleadings, depositions, discovery responses, and affidavits which establish that there is no genuine issue of any material fact. Celotex Corp., 477 U.S. at 323. The movant must "mak[e] a prima facie showing that [he] is entitled to summary judgment." Id. at 331. When there are cross-motions for summary judgment, a court "consider[s] and rule[s] upon each party's motion separately and determine[s] whether summary judgment is appropriate as to each." Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co., 176 F.3d 794, 797 (4th Cir. 1999).

B. Analysis

Because there are no genuine disputes as to the material facts and the outstanding issues are purely legal in nature, resolving this civil action on summary judgment is appropriate. Brown and Smith bring cross-Motions for Summary Judgment on the Equal Protection and Due Process claims.  Smith makes the following arguments: (1) Brown has not identified similarly situated persons; (2) restricting employment because of certain convictions is rationally linked to protecting a vulnerable population; (3) excluding robbery from the list of crimes eligible for an individualized assessment is rational; (4) Brown's still in effect good behavior condition forecloses a finding that she is fully rehabilitated; and (5) as to the Due Process claim, Brown has not identified an occupational liberty interest.  In response, Brown argues: (1) she is similarly situated to certain persons expressly exempted from the barrier law; (2) even if the barrier law has a legitimate end, its application to Brown does not serve that end; (3) Brown's lifetime ban is irrational; (4) Brown is fully rehabilitated; and (5) Brown has identified a right to pursue a calling.[4]

1. Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State . . . shall deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  To state an Equal Protection claim, a plaintiff must establish that: (1) the state has treated the plaintiff "differently from others who are similarly situated to" her; and (2) the state's "classification" of the plaintiff does not satisfy "the appropriate level of constitutional scrutiny."  Doe v. Settle, 24 F.4th 932, 939 (4th Cir. 2022).  Here, the parties agree that the

---

[4] Brown also argues that the law-of-the-case doctrine is applicable, but that argument is foreclosed by Graves v. Lioi, 930 F.3d 307 (4th Cir. 2019).

appropriate level of constitutional scrutiny is rational basis review because there is no

fundamental right or suspect classification at issue to trigger heightened scrutiny.  Under rational

basis review, the classification in the challenged law must be "rationally related to a legitimate

state interest."  City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985).

       a. Similarly Situated Prong

To establish the first prong of the Equal Protection analysis, Brown must demonstrate

that she "has been treated differently from others with whom [she] is similarly situated."  Alive

Church of the Nazarene, Inc. v. Prince William Cnty., 59 F.4th 92, 113 (4th Cir. 2023).  A

proposed comparator is "similarly situated" if that comparator is similar in ways relevant to the

goal of the law at issue, here Virginia's barrier law.  Id. at 102, 113.  The purpose of that law is

to safeguard those receiving treatment in state-licensed treatment facilities by imposing

employment restrictions on those who seek a direct care position but have been convicted of

certain crimes.

Brown has established that she is similarly situated to two groups of persons exempted

from the automatic bar to employment.  The first group is substance abuse counselors who

committed a barrier crime and were employed by a state-licensed facility before July 1, 1999,

when the barrier law was enacted ("Grandfathered Offenders").  Va. Code § 37.2-416.1(A).  The

second group is substance abuse counselors who committed a barrier crime during their

employment by a state-licensed facility ("Currently Employed Offenders").  Va. Code § 37.2-

416.1.  Although Brown is subject to a lifetime employment ban, the first set of convicted felons

may be hired to work as direct care providers without even passing an individualized assessment

provided it has been five years since their last barrier crime conviction and they were employed

before July 1, 1999, in a licensed program.  The second set of comparators includes persons

convicted of a barrier offense while employed in direct care positions at a licensed facility. They may continue to provide direct care to persons suffering from drug addiction.

Smith does not dispute that the Currently Employed Offenders are similarly situated to Brown, see Miller v. Carter, 547 F.2d 1314, 1316 (7th Cir. 1977) (finding plaintiff was similarly situated to current employees who were not subject to automatic termination upon committing a barrier crime), but argues without pointing to any evidence, that both she and the Currently Employed Offenders would be subject to the same treatment—termination. Smith bases this argument on the assumption that the Currently Employed Offender would automatically be incarcerated and that the employer would automatically fire that person. [Dkt. No. 48] at 13–14. Brown correctly responds to this argument that not every barrier crime carries a term of imprisonment and that there is no evidence in the record that Currently Employed Offenders, even if sentenced to a period of incarceration, would necessarily be terminated. Although state-licensed providers are required to develop a written policy to address criminal history background checks and what actions the provider must take if an "applicant" has certain prior convictions, 12 Va. Admin. Code § 35-105-400(B), the law is silent as to a provider's obligations with respect to monitoring existing employees' criminal histories. Mainspring's policy addresses existing employees, but it does not require termination upon conviction of a barrier crime; rather, its language is permissive, stating that "current employees are subject to termination,[5] if they have been, or later become, convicted of any exclusionary 'Barrier Crime' at any time." Mainspring Recovery, CRIMINAL BACKGROUND CHECKS & REGISTRY SEARCHES (rev. May 2024). This opportunity to receive an individualized assessment is

---

[5] That Mainspring uses the phrase "will be subject to termination" rather than "shall be terminated" means that for this class of offender, there is not a categorical bar to remaining employed.

precisely the relief Brown seeks and is unable to receive. It is also significant that Jimmy

Christmas, one of only three Department-designated screeners, submitted a declaration

explaining the factors that weigh heavily in favor of finding that a person with a criminal

conviction is rehabilitated, does not pose a risk to clients receiving direct care services, and

therefore passes the individualized screening assessment—

> a. Circumstances of the offenses. People who committed their offenses while under
> the influence of substances or to obtain money for substances, or to pay down debts
> incurred from their use of substances, are exceedingly likely to have their offense
> be related to their substance-use problems and, if they are rehabilitated, pass the
> screening assessment.
>
> b. Time since sobriety. People whose time free from using substances can be
> measured in years, rather than months, are exceedingly likely to be rehabilitated
> and pass the screening assessment.
>
> c. Time since conviction. People whose time free from being convicted for crimes
> can be measured in years rather than months are exceedingly likely to be
> rehabilitated and pass the screening assessment.
>
> d. Education and training. People who have demonstrated their commitment to the
> recovery field through education, training, and the obtainment of certifications
> and/or licenses are exceedingly likely to be rehabilitated and pass the screening
> assessment.
>
> e. Involvement in the recovery community. People who can demonstrate that they
> are active in the recovery community (outside of their career per se)—whether
> through continued involvement in twelve-step programs or through character
> references from others in recovery—are exceedingly likely to be rehabilitated and
> pass the screening assessment.

[Dkt. No. 43-55] at 5. If these factors were applied to Brown, it is hard to imagine that she

would not pass the individualized screening assessment.

Fourth Circuit case law supports a finding that Brown is similarly situated to the

Grandfathered Offenders. In Helton v. Hunt, North Carolina enacted a law that banned the

operation and possession of video gaming machines except for machines that were in lawful

operation in the state on or before June 30, 2000, and were listed on the state's ad valorem tax

rolls by January 31, 2000.  330 F.3d 242, 244 (4th Cir. 2003).  The plaintiff, who had purchased

70 new video gaming machines and operated them in North Carolina after January 31, 2000, but

before June 30, 2000, did not fall under the law's grandfather clause because his machines were

not—and could not have been—listed for ad valorem taxation by January 31, 2000.  Id. at 245.

The court found that the plaintiff machine owner and the grandfathered machine owners were

similarly situated because the only difference between them was "the date on which the[ir]

machines were present and operating in North Carolina."[6]  Id.; see also City of New Orleans v.

Dukes, 427 U.S. 297, 299 (1976) (plaintiff pushcart vendor and grandfathered pushcart vendors

were comparators in Equal Protection challenge to a city ordinance that prohibited certain

vendors from operating in the French Quarter based on the length of time they had been

operating there by a specific date).  Here, the only difference between Brown and the

Grandfathered Offenders is the date on which they were working in direct care positions.  In

other words, had Brown been employed in a direct care position before July 1, 1999, she would

not be barred from providing direct care to persons with substance abuse issues.  Accordingly,

they are similarly situated for purposes of this Equal Protection analysis.

　　　Brown also contends that she is similarly situated to a third group, persons who have

been convicted of burglary and are eligible for a screening under Va. Code § 37.2-416.1(D)

("Screened Offenders").  To establish that she is similarly situated, Brown must demonstrate that

---

[6] Smith cites one out-of-circuit case where the business owner applicant for a new beer and wine permit was not found to be similarly situated to a neighboring business that applied for a renewal permit and was subject to a grandfather clause.  Beeler v. Rounsavall, 328 F.3d 813, 817 (5th Cir. 2003).  The court concluded that their objectively similar characteristics, including their location and the goods they sold, were irrelevant and that the determining factor was that the law treated them differently.  Id. ("The Code's differential treatment of businesses applying for their first permit and businesses applying to renew their permits indicates that [the two] were not similarly situated.").

burglary and robbery are "intrinsically the same quality of offense." Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 538–39 (1942). This argument fails because robbery has a required element that the taking must be from a person and be done by force, whereas burglary does not include these two elements. See Mills v. Commonwealth, 662 S.E.2d 637, 638 (Va. Ct. App. 2008) (stating that under Virginia law, robbery is "the taking, with intent to steal, of the property of another, from his person or in his presence, against his will, by violence or intimidation") (internal citations omitted); Giles v. Commonwealth, 672 S.E.2d 879, 882 (2009) (stating that burglary is the breaking and entering of a "dwelling house of another in the nighttime with intent to commit a felony or any larceny therein"); Va. Code § 18.2-96 (stating that larceny is the act of taking "from the person of another . . . money or other thing of value").

　　At bottom, Brown has demonstrated that she is similarly situated to two comparator groups but subject to different treatment, namely, a categorical lifetime employment ban. Therefore, Brown has met her burden to establish the first prong of the Equal Protection analysis.

　　　　b. Rational Basis Prong

　　Turning to the second prong and applying rational basis review, Brown must demonstrate that the classification she challenges is not "rationally related to a legitimate state interest." City of Cleburne, 473 U.S. at 440. There is no question that safeguarding those who are suffering from drug addiction is an important governmental interest for which the legislature may impose corresponding employment restrictions. Virginia's barrier law presents an interrelated set of employment restrictions, obligations, and exemptions. It is "the classification itself, not the broad statutory scheme in which the classification resides," that is at issue. Doe, 24 F.4th at 944. Homing in on the challenged classifications, Brown brings an as-applied challenge to three provisions in the barrier law: (i) the screening provision in Va. Code § 37.2-416.1(D); (ii) the

16

Ongoing Care exception in Va. Code § 37.2-416.1(A); and (iii) the Grandfathered Offenders exception in Va. Code § 37.2-416.1(A).

In bringing these challenges, Brown is not arguing that the three provisions are facially invalid; rather, she claims that they are only invalid to the extent that they are applied to deny her mitigation from the lifetime employment ban. When a party challenges a statute's classification, "the rule [is] a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it." Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 502 (1985). Instead, courts should avoid finding a statute invalid on its face, where it may instead adopt a narrower holding that the statute is unconstitutional as applied to a defined subset of persons. See e.g., NAACP v. Button, 371 U.S. 415 (1963) (finding state's rules against solicitation by attorneys were invalid as applied to the NAACP's activities); Cantwell v. Connecticut, 310 U.S. 296 (1940) (invalidating the state offense of "breach of the peace" to the extent it was applied to prevent the peaceful distribution of religious literature). As-applied challenges, unlike facial challenges, focus on a plaintiff's characteristics that entitle her to relief. See Spokane, 472 U.S. at 502 (collecting cases); see also Richard H. Fallon, Jr., Fact and Fiction About Facial Challenges, 99 Cal. L. Rev. 915, 925 (2011) (distinguishing facial and as-applied challenges).

After identifying the classifications at issue, Brown must negate "any reasonably conceivable state of facts that could provide a rational basis" for the classifications. Heller v. Doe, 509 U.S. 312, 320 (1993) (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993)); see also McGowan v. Maryland, 366 U.S. 420, 426 (1961). That conceivable justification can be based on "rational speculation" that does not have to be supported by the legislative history or "ha[ve] a foundation in the record." Heller, 509 U.S. at 320–21 (internal citations omitted). Even where there is an "imperfect fit" between the classification and some

17

legitimate end, the challenged classification will be upheld. Doe, 24 F.4th at 944. Nevertheless, the inquiry is not "toothless." Schweiker v. Wilson, 450 U.S. 221, 234 (1981). A classification is irrational where "the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [legislature's] actions were irrational." Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 84 (2000) (quoting Vance v. Bradley, 440 U.S. 93, 96 (1979)).

### i. Unscreenable Offenses Classification

Brown first argues it is irrational to deny her a screening assessment under Va. Code § 37.2-416.1(D) because her robbery conviction (unscreenable) is intrinsically the same as a burglary conviction (screenable). Broadly, she asks the Court to find that Va. Code § 37.2-416.1(D) is invalid as applied to persons who commit any barrier crime. The result would be expanding the screening regime to cover all 176 barrier crimes rather than the approximately 30 crimes enumerated in Va. Code § 37.2-416.1(D); [Dkt. No. 43-36] at 3. Narrowly, she asks the Court to find that Va. Code § 37.2-416.1(D) is invalid as applied to persons who committed a barrier crime that is intrinsically the same as one of the crimes enumerated in Va. Code § 37.2-416.1(D). The result would be that applicants could secure a screening upon demonstrating that the conduct underlying their conviction was of essentially the same nature as one of the crimes carved out by the legislature.

Beginning with her broader argument, Brown maintains that the line-drawing for screenable burglary and unscreenable robbery goes beyond an "imperfect fit" because the 23 screenable felonies have no unifying feature (i.e., non-violent, drug-related, only against property, only against persons) that could support a finding of rationality. Additionally, Smith points to 15 significant felonies that are screenable, including, transporting drugs into the

Commonwealth, distributing date-rape drugs, distributing methamphetamine, distributing drugs to younger minors, and manufacturing methamphetamine or fentanyl around a minor. Va. Code § 37.2-416.1(D).[7] Moreover, these serious felony offenses bear a tight nexus to the employment at issue—a direct care position with recovering addicts—yet the legislature has deemed these offenders to be capable of rehabilitation, in contrast to the concerns raised by a robbery conviction, which is more attenuated from the responsibilities of a direct care provider, yet robbery offenders are banned for life.

Further, Brown argues that Virginia's lifetime employment ban is an outlier restriction. Virginia is one of only two states in the country that automatically imposes a lifetime employment ban for those convicted of committing an unarmed robbery, with the other being Idaho. Washington state was previously in this group until the Washington Supreme Court analyzed the state's barrier law's lifetime ban, on almost identical facts to those in Brown's case, and concluded that the classification was unconstitutional. See Fields v. Dep't of Early Learning, 434 P.3d 999, 1005 (Wash. 2019). On the federal level, there is no comparable lifetime employment restriction that stems from a robbery conviction, nor is federal funding for substance abuse programs conditioned on such employment bans. Moreover, the U.S. Equal Employment Opportunity Commission has issued guidance recommending that prospective employers abandon categorical bans tied to barrier crimes and, instead, assess employment eligibility by conducting an individualized assessment. See Title VII, 29 CFR Part 1601, 29 CFR Part 1606, 29 CFR Part 1607.

---

[7] Several of these offenses carry possible maximum terms of imprisonment equivalent to the robbery offense for which plaintiff was convicted. See, e.g., Va. Code § 18.2-89 (burglary).

With regard to the public interest and the law's "imperfect fit" in relation to its goal, Brown has demonstrated that the barrier law exacerbates the difficulty of hiring qualified direct care providers for those suffering from addiction, despite there being a great need for such hires. On November 21, 2016, Virginia's Health Commissioner declared that "a public health emergency resulting from opioid addiction existed in the Commonwealth of Virginia." [Dkt. No. 43-37]. Even the Department's own materials recognize that the barrier law has blocked qualified would-be hires "at a time where there is a huge workforce shortage . . . and [ ] an increasing emphasis on promoting peer recovery services." [Dkt. No. 43-41] at 7. The Department's Chief Human Resources Officer has described the law as a "challenge" to the Department's ability to hire "qualified applicants to help meet the growing [direct care] workforce needs," observing that many persons convicted of barrier crimes are "qualified applicants . . . [with] lived experience, or first-hand experience with mental health or substance use [sic] challenges, which can be . . . invaluable in the provision of services and essential to the growth of peer services." [Dkt. No. 43-36] at 12. The Department found that, because of the barrier law, "approximately 1,600 individuals over the past two fiscal years (July 1, 2022-June 30, 2023) are not eligible for employment with any DBHDS licensed private provider and at least half of those individual's conviction [sic] occurred 20+ years." [Dkt. No. 43-27]. The barrier law is impeding its own objective to curtail the addiction crisis and safeguard those suffering from substance abuse. See Peake v. Commonwealth, 132 A.3d 506, 515 (Pa. Commw. Ct. 2015) (striking down a barrier law that obligated employers to "refuse employment to qualified job candidates that it wished to hire or to retain as employees").

Given this data, it is evident that Virginia's barrier law is an outlier, its effects significantly hamper the Department's efforts to combat Virginia's addiction crisis, and the line-

drawing for screenable offenses is an "imperfect fit," at best, that permits those with serious drug convictions to serve in direct care positions upon rehabilitation, but not someone like plaintiff. They each cut away at the rationality of the challenged classification.

Although plaintiff's arguments are compelling, the Court recognizes its limited role—it is not a legislature. As recently as 2023, the Virginia legislature was confronted with these policy arguments, yet it decided to retain the restricted screening regime rather than expand screening to cover all 176 barrier crimes.

Turning to Brown's narrower argument, Brown argues that her conviction for unarmed robbery is less severe than a burglary conviction, such that she should be granted a screening. In 2002, when Brown was convicted, robbery and burglary carried a sentence of five years to life, depending on whether a deadly weapon was used. Va. Code § 18.2-58 (Repl. Vol. 1996); Va. Code §§ 18.2-89, -10(c). Today, given her specific conduct, Brown's robbery conviction would have been treated as a Class 6 felony whereas an unarmed burglary would be a Class 3 felony. A Class 6 felony carries a term of imprisonment of one to five years. Va. Code §§ 18.2-58, -10(f). A Class 3 felony carries the weightier term of imprisonment of five to 20 years. Va. Code § 18.2-10(c). Although the legislature previously considered burglary and unarmed robbery to be comparable offenses, it now treats burglary as the crime of greater gravity for sentencing purposes.

In some instances, it may be rational for a legislature to impose lesser collateral consequences for a crime that carries a greater sentence. For instance, in Doe, the Fourth Circuit assessed whether it was rational for a legislature to compel lifetime enrollment on the sex offender registry for a Class 5 felony but not a Class 4 felony. 24 F.4th at 935. The Class 4 felony was "carnal knowledge of a child," a crime that could be committed by adults or minors.

21

Id. at 938.  The Class 5 felony was "taking indecent liberties with children," a crime that could

only be committed by adults.  Id.  The Fourth Circuit concluded that even though "carnal

knowledge" was more severe conduct and carried a longer term of imprisonment, the legislature

could rationally allow those convicted of the carnal knowledge offense to remove themselves

from the registry sooner because some offenders could have been minors at the time of the

offense.  Id. at 943.

Smith argues that, likewise, the legislature could rationally determine that persons

convicted of burglary, the higher-class felony, should be eligible for screening because burglary

is a crime against property that does not necessarily involve human interaction, whereas robbery

is a crime against property and person.  See Hardy v. Commonwealth, 58 Va. 592, 605 (1867)

(describing robbery as "one of the highest [offenses] known to the law").  Although that may be

the case, Brown raises a more nuanced contention that, in some instances, a person may be

convicted of robbery even if their conduct did not involve the use of physical force or

intimidation against a person, and that excluding such persons from screening would be

irrational.  This contention is consistent with the Fourth Circuit's holding that Virginia common

law robbery is not a "violent felony" under the Armed Career Criminal Act's ("ACCA") force

clause or a "crime of violence" under the U.S. Sentencing Guidelines enumerated offenses clause

because it can be committed without the use, attempted use, or threatened use of physical force

against another.  United States v. White, 24 F.4th 378, 381-82 (4th Cir. 2022) (Virginia common

law robbery does not qualify as a violent felony under the ACCA's force clause because it "can

be committed by threatening to accuse the victim of having committed a crime against nature");

United States v. Parham, 129 F.4th 280, 288 (4th Cir. 2025) (because Virginia common law

robbery can be committed with no physical force, it is "broader than the generic form of

robbery" and is not a crime of violence under the Guidelines' enumerated offenses clause). Accordingly, the legislature's decision to allow individualized screenings for persons convicted of Class 3 burglary, which carries a maximum sentence of 20 years, but categorically deny them for persons convicted of Class 6 non-violent robbery,[8] which carries a maximum sentence of five years, appears to have no rational basis.

### ii. Ongoing Care Offenders Classification

Brown claims that there is no rational basis for the Ongoing Care Offenders classification, which exempts persons hired into direct care positions before they were convicted of a barrier crime from the barrier law's employment restrictions. Under this classification, a state-licensed provider could continue to employ a substance abuse counselor who was convicted of robbery during that employment. Given the barrier law's intent to protect vulnerable persons undergoing substance abuse treatment from interacting with certain convicted felons, there can be no sound reason to allow this group of offenders to retain their direct care positions. Although state-licensed providers may implement a policy requiring existing employees to report any significant changes to their background check information, as Mainspring does,[9] there is nothing in the barrier law that requires them to do so. When asked during her deposition about

---

[8] As explained above, Brown's robbery conviction would be a Class 6 felony today.

[9] Mainspring's policy on Criminal Background Checks and Registry Services for existing employees states:

> Employees should report any significant changes to the information reflected in their most current background check within two (2) working days of any final action related to the updated information. Any employee who refuses to provide information required to perform such check will be subject to termination. Employees whose background check reveals information that would preclude an individual from being employed by the facility under applicable law will be subject to termination.

[Dkt. No. 48-4] at 3.

existing employees who are convicted of barrier crimes, Malinda Roberts, the Department's

Background Investigations Supervisor, testified that it is up to the provider to implement a policy

to govern that situation:

> It is the understanding of [the Department] that [the provider] will have a policy in
> place regarding charges—criminal charges and convictions after [the employee]
> has been hired, in regards to notifying the employer that they have been charged
> with a crime. Then it's the employer's—it's the employer's responsibility as to
> what they do after that.

[Dkt. No. 26-10] at 10.

Smith argues that the Ongoing Care Offenders classification is of no consequence

because anyone convicted of robbery "with a sentence similar to Plaintiff's would have to leave

employment to serve the sentence." It is true that someone convicted of robbery and sentenced

to several years of incarceration would have to leave their employment; however, not all persons

convicted of robbery necessarily receive a term of imprisonment or an extensive term of

imprisonment. Under Virginia law, a person convicted of Class 6 felony robbery could be

sentenced to only a brief amount of incarceration or a fine, which would not necessarily result in

their prolonged absence from work and subsequent termination. Permitting Currently Employed

Offenders to serve in direct care roles after being convicted of robbery, yet categorically barring

Brown from being able to have an individualized screening assessment is irrational, especially

given the law's stated intent to protect vulnerable persons. How is that goal served by allowing

one felon to retain their position and permanently barr the other?

The Seventh Circuit addressed a similar barrier crime law in <u>Miller v. Carter</u>, which

found that a city ordinance permanently barring persons convicted of certain offenses from

obtaining a chauffeur's license violated Equal Protection because a person convicted of one of

those same offenses while already holding a chauffeur's license could be allowed to retain it.

24

547 F.3d 1314, 1316 (7th Cir. 1977). The city's justification for different treatment of persons convicted of a barrier crime after receiving their license was that such persons had a track record against which the city could balance their felony conviction in evaluating fitness. Id. The court questioned the validity of this justification given that a licensee had "an opportunity to obtain a favorable exercise of this discretion regardless of how short a time the license ha[d] been held." Id. This meant that someone who was convicted of armed robbery within a few days of receiving their license would be eligible to retain the license but someone who had the same conviction could never obtain a license. In finding that this distinction violated Equal Protection, the court stated:

> Such distinctions among those members of the class of ex-offenders are irrational, regardless of the importance of the public safety considerations underlying the statute or the relevance of prior convictions to fitness. In fact, allowing existing licensees who commit felonies to continue to be eligible for licensing undercuts the reasonableness of the basis for the classification, which is that the felony is per se likely to create a serious risk which cannot be sufficiently evaluated to protect the public through individualized hearings. An applicant for a license who has committed one of the described felonies and a licensee who has done the same are similarly situated, and no justification exists for automatically disqualifying one and not the other. Accordingly, insofar as Ch. 28.1-3 and 28.1-10 discriminate irrationally among the class of ex-offenders, they violate the equal protection clause of the Fourteenth Amendment.

Id.

Although Miller is not binding authority, its reasoning is highly persuasive. There is no justification for allowing Ongoing Care Offenders to work directly with persons suffering from substance abuse issues while automatically disqualifying Brown from doing the same. If a robbery conviction is per se likely to create a serious risk to vulnerable persons seeking addiction treatment, then allowing persons convicted of robbery to remain in direct care positions simply because they were in the position before they committed their crime undercuts the barrier law's goal and is irrational as applied to

Brown and those like her. Because this classification is unrelated to the achievement of any legitimate state interest, Brown prevails on her Equal Protection claim and the Department will be enjoined from enforcing Va. Code § 37.2-416.1 against Brown and must permit her to undergo an individualized screening assessment pursuant to Va. Code § 37.2-416.1(F).

### iii. Grandfathered Offenders Classification

Brown also points to the classification in the grandfather clause by which certain persons who were working in direct care positions before the barrier law was enacted and who are not subject to barrier crime restrictions when applying for new direct care positions. Specifically, the clause allows a Department-licensed provider to "new[ly] employ" a person with a barrier crime conviction "in an adult substance abuse . . . [direct care] treatment position in another office or licensed program" if such person was "employed prior to July 1, 1999, in a licensed program" and "had no convictions in the five years prior to the application date for employment." Va. Code § 37.2-416.1(A). Brown asks the Court to find that the Grandfathered Offenders exception is invalid to the extent that it denies mitigation for those, like her, who have experience in a direct care role, committed their barrier crime at least five years before their employment began, and their criminal behavior was substantially related to their substance abuse or mental illness. To succeed, Brown must negate every conceivable basis that could support providing mitigation to Grandfathered Offenders but not to her.

Smith argues that Brown cannot rely on the grandfather clause because the legislature was accommodating the reliance interests of those working for Department-licensed providers before the law took effect. Indeed, courts have upheld grandfather clauses that were based on reliance interests when challenged on Equal Protection grounds. See e.g., U.S. R.R. Ret. Bd. v.

Fritz, 449 U.S. 166, 178 (1980) (upholding grandfather clause that retained windfall benefits for retired employees and employees who had worked for at least 10 years); Dukes, 427 U.S. at 305 (upholding grandfather clause that permitted access to the French Quarter for two pushcart vendors that had operated continuously there for over 20 years and had "likely built up substantial reliance interests in continued operation"); Heckler v. Mathews, 465 U.S. 728, 751 (1984) (upholding grandfather clause that retained spousal benefits for employees who worked for years and "planned their retirements in reasonable reliance on the law in effect"). The typical fact pattern in "reliance interest" cases is that a stakeholder has operated for years in reliance on the law and the grandfather clause permits them to continue operating because of that past reliance.

Here, the grandfather clause protects the reliance interests of persons with barrier crime convictions who were working in direct care positions for Department-licensed providers before the law took effect in 1999. In her deposition, Ms. Roberts explained the rationale for the grandfather clause when she testified, "[I]f someone [who had a barrier crime conviction was] working for one of our providers, our licensed providers, or our community services boards, prior to July 1st, 1999, the individual would be considered grandfathered-in, because they could not be held accountable for a law that did not exist . . . when they were hired." See [Dkt. No. 43-59] at 30.

Although it may be rational to accommodate the reliance interests of certain persons engaged in purely economic activity, such as owners of video gaming machines and pushcart vendors, such accommodation makes no sense when the law in question seeks to protect a vulnerable population. See Miller, 547 F.3d at 1316 ("no justification exists for automatically disqualifying one [offender] and not the other" where the law was intended to protect public

27

safety). If the Grandfathered Offenders are deemed suitable to work in direct care positions simply because they worked in such positions before the law's enactment and therefore had the opportunity to show they were fit, then why not allow a similarly situated offender such as Brown the opportunity to also show that they have been rehabilitated and pose no risk to vulnerable persons? There can be no harm in providing Brown with an individualized screening assessment, especially given the "huge workforce shortage" and urgent need for peer recovery services for persons struggling with addiction. Because there is no rational basis for allowing the Grandfathered Offenders to provide direct care services to vulnerable, drug-addicted persons while automatically barring Brown from doing the same, the law violates the Equal Protection Clause for this reason as well.

2. Due Process Claim

Brown and Smith also move for summary judgment on the Due Process claim. Their dispute reduces to whether Brown has identified a constitutional right to work in a direct care position for a state-licensed provider. There is no broadly defined fundamental right to work. As the Supreme Court has explained, "the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation." Prynne v. Settle, 848 F. App'x 93, 104 (4th Cir. 2021). Despite Brown's factually accurate contention that the barrier law practically blocks her from most direct care positions because these positions are largely unavailable outside Department-licensed facilities,[10] her claim fails because she has not identified a protected liberty interest under the Due Process Clause.

---

[10] The record reflects that there are some private direct care facilities that are not subject to these restrictions, but there are very few of them.

III. CONCLUSION

For the above-stated reasons, the parties' cross-motions for summary judgment [Dkt. Nos. 42, 44] will be granted in part and denied in part, and defendant will be ordered to provide Brown with an individualized screening assessment, which if she passes, will permit her to provide direct care services in state-licensed facilities to persons suffering from drug addiction.

Entered this __30th__ day of September, 2025.

Alexandria, Virginia

_____ /s/

Leonie M. Brinkema
United States District Judge